**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JERMAL RICHARD TOWLER,              CASE NO. 2:07-cv-726
                                           JUDGE GRAHAM

        **Petitioner,**                    MAGISTRATE JUDGE KEMP

**v.**

MICHAEL SHEETS, Warden,

        **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> By indictment filed April 11, 2003, defendant was charged with one count of aggravated murder in violation of R.C. 2903.01, with a firearm specification under R.C. 2941.145, arising out of the August 10, 2002 death of Channing Allen. Pursuant to a trial held on January 9, 12 and 13, 2004, a jury found defendant guilty of aggravated murder, including the firearm specification. The trial court sentenced defendant to 20 years to life, with an additional three years for use of a firearm. Defendant's two assignments of error, which we consider jointly, assert the judgment of the trial court finding him guilty of aggravated murder with a specification is not supported by

sufficient evidence or the manifest weight of the evidence.

\*\*\*

According to the state's witness Lamont Crenshaw, he and his brother Henry stayed at 1307 E. 25th Avenue ("the residence") during the early part of 2002. When defendant started living with them, Henry moved out of the duplex. While Lamont continued to live there, he also stayed with his mother on the north end of Columbus and sometimes stayed with his girlfriend. According to Lamont, defendant had the back bedroom, sold drugs for a living, and carried a gun every day.

Between 11:30 p.m. and midnight on August 9, 2002, Lamont went to the residence, where he, Kwasi Rouse, Allen, also known as "Cuzzo," and defendant were to meet before going to the 504 Club. Rouse arrived with Lamont; defendant was already there. Rouse went to the back bedroom, and Lamont went to the front bedroom, both changing clothes in preparation for the evening. Downstairs, defendant and Cuzzo were arguing, as they had been when Lamont walked in, and they were becoming progressively louder. Although Lamont yelled for them to break it up, and went downstairs in an effort to accomplish that end, he was unsuccessful and returned upstairs. He heard defendant during the argument state, "[a]in't nobody about to leave this bitch. I'll kill everybody in this motherfucker." (Tr. Vol.II, 286.)

According to Lamont, he got tired of hearing them argue, so after a while he went back downstairs to tell them to stop. While he was on the stairs, he heard gunshots. When he returned upstairs, he scooped up miscellaneous items from a table, put them in his pocket and jumped out the front window. Among the items he took were Cuzzo's watch and chain, so Lamont could keep them from being stolen and return them to the victim's family. Lamont heard more shots as he jumped out the window and went to a neighbor's yard.

2

Lamont testified he knew who shot the victim because, at the time of the shooting, Lamont and Rouse were getting dressed, and the victim did not have a gun. He admitted he did not go back for Cuzzo or wait for the police, stating he was terrified. Instead, he went looking for comfort from friends at the 504 Club. He eventually spoke with the police on three separate occasions to tell them what happened. He also met with the victim's family and gave them the chain and watch.

Rouse's testimony was consistent with Lamont's in some aspects, but diverged in others. According to Rouse, when he arrived, only defendant was at the residence; Cuzzo came later. Rouse and Lamont arrived separately, but at exactly the same time. During Rouse's stay, defendant and Cuzzo began to argue. As the argument continued, Rouse was in the back bedroom changing clothes; Lamont was mostly in the bathroom, but occasionally attempted to break up the argument.

In getting ready for the evening, Rouse went downstairs to look for shoestrings and a belt. As he leaned over the couch looking in the corner for accessories, he heard a shot that came from inside the back door, and he ducked. He did not see who was shooting. He ran up the steps and into the back bedroom, when he heard Cuzzo scream. Rouse began to go out the window of the back bedroom, but he heard more shots fired. Because the shots sounded like they were coming from the back of the residence, he hesitated for a minute and saw defendant run down the alley from the back of the residence. As Rouse flipped from the window toward the roof over the back door, he saw someone, referred to as Art, standing there. Rouse asked for help in getting down, but because the person was too slow in responding, Rouse jumped and ran in the direction opposite that which defendant ran.

As Rouse was leaving, he threw on the shorts he had taken off in getting ready for the evening; in one of the pockets was a cell phone. He called Lamont to see if he was harmed and met Lamont on the street; they got into Rouse's vehicle and drove

to Lamont's father's house.

While Lamont and Rouse testified to four occupants in the house, the state produced a fifth person, Norma Jean Whitson, a crack addict who cleaned the residence. She started cleaning for Lamont and Henry Crenshaw before defendant lived there and continued after defendant moved in. Her tasks included assisting in the care of two pit bull dogs and their puppies. She cleaned every day and took care of the dogs by feeding them once a day. According to Whitson, both Lamont and defendant sold marijuana at the address.

On August 9, 2002, she went to the residence at 11:30 p.m. or midnight to clean for that day; defendant and Cuzzo were there. Cuzzo asked her to get him something to drink at the store. When she returned from the store, both defendant and Cuzzo seemed fine, and she began to clean the kitchen. At some point, defendant and Cuzzo began arguing. Defendant went outside, leaving Cuzzo standing in the doorway.

According to Whitson, Cuzzo said, "[i]f we fight, let's fight head up, and we don't need no guns," and Cuzzo asked defendant to take the gun out of his pocket. (Tr. Vol.II, 428.) Whitson turned around to start washing dishes and heard a shot that sounded like it came from outside. As she turned to go downstairs to retrieve the puppies, she saw Cuzzo crawling toward her at the sink, crying for help. When she came back upstairs, she saw defendant standing over the body with a gun in his hand. Defendant ran up the stairs, and Whitson ran out with the puppies to the next door residence. When she made her way to the upstairs next door, she heard additional shots. She did not call the police or help the victim.

Kim Onyeneho lived in the other half of the duplex at 1309 E. 25th Avenue. In the late evening of August 9 or early morning hours of August 10, she was half asleep on a couch when she heard gunshots. She turned out the light because she was afraid and she peeked through the window to see two people dragging a body. Both African-Americans, the man wore a red

4

shirt and blue jeans, and the woman was wearing all black. She later learned the man was Art and the woman was Peaches.

On August 10, 2002 at 12:30 a.m., the police were dispatched to the rear of the residence where they found someone lying face down. The victim was a partially unclothed African-American male, who appeared unconscious and bore gunshot wounds to the head. While the victim was found about 100 feet from the residence, the police saw a trail of blood that led from the victim to the back porch of the residence. The back porch was covered in blood that left a trail through the doorway, so the police believed the body came from the rear of the residence. On entering the residence to look for any other victims or a possible suspect, the police saw a large pool of blood in the kitchen area, but no one else was in the house. The cement steps to the residence were wet, and they appeared as if someone had tried to wash the blood off the steps. A search premised on the Kentucky license plates on the Dodge Intrepid found at the scene revealed the victim's picture.

In April 2003, John Davis, a patrol officer with the Columbus Division of Police who had been called to the residence on the night of August 10, 2002, observed a vehicle that failed to signal a change of direction. Davis turned in behind the vehicle, with beacons on, to make the traffic stop. The driver pulled over and put his vehicle in park. As Davis approached the vehicle, the driver put the vehicle in drive and sped off. Davis went back to his cruiser and asked for helicopter assistance in following the vehicle.

In his cruiser, Davis followed the driver. Going approximately 15 to 20 m.p.h., the driver opened his door and jumped from the vehicle, rolling three or four times in front of the cruiser. Davis had to stop his car and even then almost hit the driver, who jumped up and began running; the driver's car crashed into a parked vehicle. When Davis apprehended the driver, he asked his name, and the driver responded with false information. When Davis advised he was taking the driver to police headquarters for identification, the driver admitted he

was Jermal Towler. Davis knew the name and that he was wanted pursuant to an active arrest warrant for murder.

According to Dr. Dorothy Dean, a deputy coroner for the Franklin County Coroner's office and a forensic pathologist, the victim was shot eight times; he exhibited eight entrance wounds and two exit wounds. She found bullets and fragments inside the body from six wounds, and a test of the victim's blood indicated marijuana and marijuana products. According to Dr. Dean, the victim died "from gunshot wounds to the head with perforation of his skull and brain." (Tr. Vol.III, 499.)

The state also presented the testimony of Mark Hardy, a criminalist with the Columbus Division of Police, who is an expert in firearm evaluation and identification. He testified that the bullets and fragments from the body that he examined had grooves consistent with a Taurus .44 weapon that defendant owned; police found the box for the gun at the residence. Hardy admitted, however, he could not say with certainty that the bullets came from that gun. Similarly, he testified that the bullets were not consistent with being fired from the gun that came out of the Desert Eagle box also found at the residence, but Hardy could not absolutely exclude that gun.

Defendant presented no evidence, relying instead on the cross-examination of the state's witnesses. At the conclusion of the state's case, defendant moved pursuant to Crim.R. 29 for acquittal, and the trial court overruled the motion.

*State v. Towler*, 2004 WL 2757849 (Ohio App. 10th Dist. December 2, 2004).  Represented by new counsel, petitioner filed a timely appeal.  He raised the following assignments of error:

FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN ENTERING JUDGMENT OF CONVICTION AGAINST DEFENDANT-APPELLANT

> INASMUCH AS THAT JUDGMENT WAS RENDERED
> AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> SECOND ASSIGNMENT OF ERROR
>
> THE TRIAL COURT ERRED IN ENTERING JUDGMENT OF
> CONVICTION AGAINST DEFENDANT-APPELLANT
> INASMUCH AS THAT JUDGMENT IS NOT SUPPORTED BY
> LEGALLY SUFFICIENT EVIDENCE

*See id.* On December 2, 2004, the appellate court affirmed the trial court's judgment. *Id.*

Petitioner filed a timely appeal to the Ohio Supreme Court in which he raised the same

propositions of law. *Exhibit 10 to Return of Writ.* On April 13, 2005, the Ohio Supreme

Court denied leave to appeal and dismissed the appeal as not involving any substantial

constitutional question. *State v. Towler*, 105 Ohio St.3d 1499 (2005).

Petitioner also pursued post conviction relief:

> On August 17, 2004, while defendant's direct appeal was
> pending, he filed a petition for postconviction relief pursuant
> to R.C. 2953.21. Defendant also filed a motion for the
> appointment of counsel and a motion for expert assistance. In
> his petition for postconviction relief, defendant alleged
> ineffective assistance of counsel, prosecutorial misconduct, and
> that there was insufficient evidence to support a conviction. On
> September 9, 2004, the state filed a motion to dismiss
> defendant's petition for postconviction relief. On March 14,
> 2005, the trial court dismissed defendant's petition for
> postconviction relief, denied his motion for appointment of
> counsel, and denied his motion for expert assistance.
>
> Defendant appeals and has set forth the following two
> assignments of error:
>
> I. The trial court erred when it failed to hold an evidentiary
> hearing on post-conviction relief pursuant to Ohio Revised

Code § 2953.21(c).

II. The trial court erred when it denied petitioner's claim of
prosecutorial misconduct.

*State v. Towler*, 2006 WL 1351605 (Ohio App. 10th Dist. May 16, 2006).  On May 16, 2006, the

appellate court affirmed the trial court's dismissal of petitioner's post conviction petition.

On October 4, 2006, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Towler*, 111 Ohio St.3d 1414 (2006).

Meanwhile, on November 2, 2005, petitioner filed a *pro se* delayed application to

reopen the appeal pursuant to Ohio Appellate Rule 26(B).  Petitioner asserted  the

ineffective assistance of appellate counsel due to his attorney's failure to raise on appeal

claims of insufficiency of the evidence due to the State's failure to prove prior calculation

and design, and trial counsel's failure to object to the trial court's imposition of sentence

without making appropriate findings of fact under O.R.C. §2929.19(B).  *See Exhibit 13 to*

*Return of Writ*.  On December 30, 2005, the appellate court denied petitioner's Rule 26(B)

application as untimely.  *Exhibit 16 to Return of Writ*.  Petitioner apparently never filed an

appeal of the appellate court's decision to the Ohio Supreme Court.

On July 27, 2007, petitioner filed the instant *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in

violation of the Constitution of the United States based upon the following grounds:

1.  Petitioner was denied the effective assistance of counsel
guaranteed him under the Sixth Amendment to the U.S.
Constitution.

8

Petitioner's attorney failed to investigate the facts of the case when the[re] was a potential witness that could have changed the result of the verdict.

2. Petitioner was denied due process of law when the evidence was insufficient to convict petitioner of the elements of agg[ravated] murder beyond [a] reasonable doubt.

The State of Ohio lacked sufficient evidence to establish petitioner's guilt of all the elements of aggravated murder when there were two firearms involved and no eyewitnesses to either shooting.

3. Petitioner was denied due process of law when the conviction was against the manifest weight of the evidence.

Conflicting and contradictory testimonial evidence that was deemed unbelievable given by state witnesses at trial about the events of the crime caused the jury to clearly lo[o]se its way when determining petitioner committed aggravated murder.

It is the position of the respondent that claims one and two are without merit and claim three is not cognizable in federal habeas corpus review.

## CLAIMS TWO AND THREE

In claims two and three, petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions and that his convictions were against the manifest weight of the evidence. The state appellate court rejected these claims in relevant part as follows:

As defendant accurately contends, the testimony of the state's witnesses, and in particular the testimony of Lamont Crenshaw, is not consistent. In determining the sufficiency of the evidence, however, we construe the evidence in favor of the state. Here, the testimony of Lamont Crenshaw, Kwasi Rouse, and Norma Whitson, if construed in the state's favor,

9

establishes that the unarmed victim and defendant, armed with a gun, were engaged in a progressively escalating argument, leading to defendant's threatening to kill all the occupants of the house. While Crenshaw was on the stairs, Rouse was in the living room looking for accessories, and Whitson was in the kitchen washing dishes, they heard a gunshot. Whitson looked to find defendant standing over the victim holding a gun. The bullets and bullet fragments recovered from the scene and from the victim are consistent with being fired from the gun defendant was known to own. Defendant's contentions about the sufficiency of the evidence are unpersuasive.

***

Defendant accurately points to matters in the testimony of the state's witnesses which could cause a reasonable juror to question the testimony presented. In particular, neither Lamont Crenshaw nor Rouse testified to Whitson's presence in the residence, yet she offered significant evidence in support of the state's case against defendant. Defendant also notes that Lamont Crenshaw testified he took the victim's jewelry and returned it to the victim's family, but nonetheless admitted he lied three times to the police when they questioned him about the jewelry. In addition, despite the friendship Rouse and Crenshaw enjoyed with the victim, after the shooting they did nothing to attend to the victim and failed to speak with the police until sometime later. Instead, they went to a club where they joined their friends. In a similar vein, although Whitson testified that she retrieved the puppies from the basement of the residence to remove them to the house next door, she did nothing to assist the victim, and she too failed to call the police.

In response, the state contends that the testimony of Lamont Crenshaw and Kwasi Rouse was believable when they stated they did not know Whitson was in the residence. According to the testimony, Whitson left the residence to retrieve a drink for the victim, and on her return she was in the kitchen, out of sight from much of the remainder of the downstairs. Moreover,

10

the state submits that Lamont posited an explanation for his failure to tell the police about the victim's jewelry, citing his emotional state, which he also used to explain his conduct at the club subsequent to the shooting. Lastly, while the state acknowledges Lamont's failure to tell the truth to the police in some details, the state contrasts that with defendant who fled when he was apprehended in a traffic stop.

Although the inconsistencies in the testimony of the state's witnesses realistically could cause a juror to question the credibility of certain portions of that testimony, we cannot conclude the inconsistencies in the testimony render it so beyond belief that a reasonable juror could not accept it as true. Not only does the state posit explanations for the discrepancies defendant notes, but in addition the state's witnesses corroborated each other in significant aspects. As a result, even if the uncorroborated testimony be ignored, the remaining evidence supports defendant's conviction. *State v. Harris* (1991), 73 Ohio App.3d 57, 67, 596 N.E.2d 563. Specifically, the state's witnesses generally agreed that the unarmed victim and defendant, armed with a gun, were arguing to the point of defendant's threatening to kill all the occupants of the house. While Crenshaw was on the stairs and Rouse was in the living room looking for accessories, they heard a gunshot; Rouse saw defendant run away in the alley behind the house. If the testimony of the fifth person be added to that of Lamont Crenshaw and Rouse, the jury also had Whitson's testimony that she heard the gunshot and eventually found defendant standing over the victim and holding a gun. Although the possibility exists that Rouse, Crenshaw and Whitson fabricated their testimony, the jury found it believable, and we cannot say the jury lost its way in so concluding.

Accordingly, defendant's two assignments of error are overruled, and the judgment of the trial court is affirmed.

*State v. Towler, supra,* 2004 WL 2757849.    The findings of the state appellate court are

presumed to be correct:

11

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §2254(e)(1).  Further, a federal District Court may not grant habeas corpus relief unless the state court decision contravened or unreasonably applied  federal law as established by the United States Supreme Court or resulted in an unreasonable determination of the facts:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

> A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the

12

facts before it in an unreasonable manner. *Id.* at 413, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Maldonado v. Wilson,* 416 F.3d 470, 475 (6th Cir.2005). Petitioner has failed to meet this standard here. *See Williams v. Taylor , supra.*

Petitioner's claim that his convictions were against the manifest weight of the evidence does not present an issue appropriate for federal habeas corpus review. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without proof sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle,* 703 F.2d 959, 969 (6th Cir. 1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence and the credibility of the witnesses. *Jackson,* 443 U.S. at 319; *Walker,* 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a

13

new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida,* 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, petitioner's claim that his conviction was against the manifest weight of the evidence cannot be considered by this Court.

Petitioner also contends that the evidence was constitutionally insufficient to sustain his convictions. Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra,* 443 U.S. at 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West,* 505 U.S. 277, 296 (1992)(citing *Jackson,* at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." ' *Id.* (quoting *Jackson,* at 326). For example the trier of fact is entitled to disbelieve a defendant's uncorroborated and confused testimony, and even to discount a defendant's credibility on account of a prior felony conviction. *Id.*

Despite the factual findings of the state appellate court, petitioner argues that his convictions must be overturned due to a lack of evidence indicating he took part in

14

removing the victim's body from the scene of the crime; because State's expert witnesses testified that two different firearms were used in the offense; and because there was no evidence establishing either that petitioner had more than one firearm when he shot Allen or conclusively linking petitioner and his gun to the bullet that caused Allen's death. *See Traverse*. None of the foregoing arguments are persuasive.

Upon review of the entire record and in view of the facts already detailed by the state appellate court, this Court agrees, when viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra*, the evidence was constitutionally sufficient to sustain petitioner's convictions. Regardless of any lack of evidence indicating petitioner took part in removing the victim's body from the scene of the crime, prosecution witnesses testified that petitioner and Allen argued, and thereafter, petitioner, who was known to carry a weapon, carried out his threat to kill Allen. Three witnesses in the home heard the gunfire. One of those, Norma Jean Whitson, watched Allen crawl towards her after being shot. She saw petitioner standing over Allen's body holding a gun. She watched him run upstairs to his room where presumably he kept another gun. Another witness saw petitioner running from the apartment immediately after gunshots subsided. Prosecution expert witnesses testified that bullets from two different weapons were found in Allen's body, *Transcript,* at 518,530; however, it was the theory of the prosecution that petitioner ran to his room after incapacitating the victim to obtain another weapon with which he fired the mortal shots. *Id*., at 561-62. Petitioner was known to carry a gun, *Id*., at 61-62, 278-279, 314, 434, and, as noted by the state appellate court, "[t]he bullets and

15

bullet fragments recovered from the scene and from the victim [were] consistent with being fired from the gun defendant was known to own."

Claims two is therefore lacking in merit.

## CLAIM ONE

In claim one, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to call defense witnesses. Specifically, petitioner complains that his attorney failed to call Patricia Ann Palmer, also known as "Peaches," Arthur Whitehead, or police who interviewed Palmer and Whitehead. According to petitioner, Palmer would have testified that Lamont Crenshaw was present at the scene of the crime after Allen had been killed, thus contradicting Crenshaw's testimony that he fled from the scene at trial.[1] Additionally, petitioner contends that Palmer would have established that it was Crenshaw's mother who ordered Palmer and Whitehead to remove the victim's body from the house, thereby establishing that it was Lamont Crenshaw, and not petitioner, who killed Allen. *See Traverse.*

In support of these allegations, petitioner refers to his own affidavit, as well as affidavits from John Forester and his appellate attorney. *See Attachments to Exhibit 17 to Return of Writ.* Petitioner states in his affidavit that, while in jail, Whitehead told petitioner that charges had been filed against him for moving Allen's body from the scene of the

---

[1] Kwasi Rouse also testified that he and Lamont drove to Lamont's father's house immediately after the shooting. *Id.*, at 382.

16

crime, and that if charges were not reduced to a misdemeanor, he would tell the "truth" about how Lamont Crenshaw had ordered Whitehead to move the victim and was present at that time.  *See id.*  Petitioner also states in his affidavit that defense counsel said Palmer told detectives she was at the home of Lamont Crenshaw's mother when the shooting took place and she saw Lamont there.  Palmer would say, according to petitioner, that Lamont's mother told them to clean up the mess.  *See id.*  John Forester states in his affidavit that he overheard the discussion between petitioner and Whitehead discussed, *supra*.  *See id.* Finally, Dennis Pusateri, petitioner's appellate counsel, states in his affidavit that Mark Hunt, petitioner's trial attorney, told Pusateri that Whitehead and Palmer made exculpatory statements to police.

Notably, petitioner did not attach affidavits from Palmer or Whitehead in support of his claim in these proceedings or before the state courts.  Instead, he refers to police reports summarizing interviews of Palmer and Whitehead attached to his post conviction appeal; however, the state appellate court refused to consider these documents in support of his claim because petitioner failed to present the reports to the state trial court:

> As a preliminary matter, we observe that defendant has attached to his merit and reply appellate briefs "informational summaries" of police interviews of Patrice "Peaches" Palmer and Arthur Whitehead. These informational summaries were not submitted in support of defendant's petition for postconviction relief, nor are they otherwise part of the record. As such, we will not consider them in this appeal. See *Chickey v. Watts,* Franklin App. No. 04AP-818, 2005-Ohio-4974, ¶ 14 ("[a]ppellate review is limited to the record as it existed at the time the trial court rendered its judgment").

*State v. Towler, supra,* 2006 WL 1351605. Arguably, therefore, although neither of the parties

have raised the issue, this Court therefore is precluded from considering such documents

in support of petitioner's claim in these proceedings. See 28 U.S.C. § 2254(e); *Holland v.*

*Jackson,* 542 U.S. 649 (2004)(reversing the Sixth Circuit's grant of a petition for a writ of

habeas corpus on the basis of evidence not considered by the state courts); *Owens v. Frank*,

394 F.3d 490, 498 (7th Cir. 2005), quoting *Boyko v. Parke,* 259 F.3d 781, 790 (7th Cir.2001);

*Cargle v. Mullin*, 317 F.3d 1196, 1209 (10th Cir. 2003), citing *Boyko v. Parke, supra,* and *Dorsey*

*v. Chapman,* 262 F.3d 1181, 1190 (11th Cir.2001); *Cooper-Smith v. Palmateer,* 397 F.3d 1236,

1141-42 (9th Cir.2005).

Regardless, however, of whether this Court considers the police reports referred to

by petitioner, his claim of ineffective assistance of counsel fails. The police reports referred

to by petitioner indicate that Palmer told police she was at Polly's house, *i.e.*, the mother

of Lamont Crenshaw, when Allen was killed. She heard gunshots. "Jean the Maid" came

running to the back door screaming and yelling. Somebody said that "Murder" or "Mellie"

had shot someone.[2] Palmer saw Lamont inside Polly's house after the shooting. It was

Polly's idea to move the body. Palmer was going to help, but could not. Whitehead

adamantly denied any involvement in moving the body. He did not see anything. *See*

*Attachments to Exhibit 24 to Return of Writ.*

The state appellate court, without considering the foregoing information, rejected

---

[2] Petitioner was known by the name of "Mellie." *Transcript,* at 58.

petitioner's ineffective assistance of counsel claim as follows:

***

... [D]efendant alleged that his trial counsel, Mark Hunt, was ineffective because he did not call Peaches or Mr. Whitehead as witnesses at trial or present statements those persons made to the police.

In order to establish ineffective assistance of counsel, defendant must meet the two-part test outlined in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052. First, defendant must demonstrate that his trial counsel's performance was deficient. Namely, defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. A court reviewing an ineffective assistance of counsel claim must determine whether, under the circumstances, the acts or omissions were "outside the wide range of professionally competent assistance." *Id*. at 690. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490.

Second, in order for defendant to establish ineffective assistance of trial counsel, he must demonstrate that the deficient performance prejudiced him. This requires defendant to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In support of his petition for postconviction relief, defendant submitted two affidavits signed by himself, as well as affidavits signed by Dennis Pusateri, his counsel in the direct appeal to this court, and John W. Forester. However, defendant did not submit any affidavit signed by either Peaches or Mr. Whitehead.

19

In regard to defendant's own affidavits, the trial court exercised its sound discretion and applied the factors outlined in *Calhoun* in order to assess whether to accept defendant's affidavits as true statements of fact. In this regard, the trial court observed that the judge reviewing defendant's postconviction petition presided over defendant's trial and sentencing, his affidavits are self-serving, and are almost completely based on hearsay. Upon reviewing defendant's affidavits, the trial court found them to lack credibility.

Mr. Pusateri averred in his affidavit that Mr. Hunt, defendant's trial counsel, informed him that he had seen statements from Peaches and Mr. Whitehead, and that "those statements, as given, were exculpatory to Jermal Towler." (June 14, 2004 Affidavit of Dennis Pusateri.) As noted by the trial court, Mr. Pusateri's statement constitutes hearsay, as it was based on Mr. Hunt's out-of-court statement.

Mr. Forester averred in his affidavit that he overheard a conversation between defendant and Mr. Whitehead, which occurred at the Ross Correctional Institution. According to Mr. Forester, Mr. Whitehead informed defendant that, after the shooting, Lamont Crenshaw told him and Peaches to move the victim's body to the alley adjacent to the residence where the victim was shot, thereby placing Mr. Crenshaw at the scene after the shooting. The trial court noted that, just as Mr. Pusateri's affidavit, Mr. Forester's affidavit was based on hearsay.

Even accepting the information in Mr. Pusateri's and Mr. Forester's affidavits as true, defendant failed to demonstrate any constitutional error entitling him to a hearing. Mr. Pusateri's affidavit does not detail why the statements of Peaches and Mr. Whitehead were "exculpatory." Nonetheless, Mr. Forester averred in his affidavit that Mr. Whitehead had informed defendant that he and Peaches were told by Mr. Crenshaw to move the victim's body after the shooting. Mr. Crenshaw testified at trial that, upon hearing gunshots, he jumped out the front upstairs window of the residence where the victim was shot, went to a neighbor's yard, and did not go back for the victim or wait for the police. Thus, the evidence

20

that Mr. Crenshaw was at the scene after the shooting and instructed Peaches and Mr. Whitehead to move the victim's body would have conflicted with Mr. Crenshaw's testimony as to his actions after the shooting. However, it would not have contradicted the evidence that defendant and the victim, who was unarmed, were engaged in a progressively escalating argument, that defendant threatened to kill all the occupants of the house, that defendant was seen standing over the victim holding a gun, and that the bullets and bullet fragments recovered from the scene and the victim were consistent with being fired from the gun defendant owned. See *Towler,* supra. Moreover, despite arguing in his petition that his trial counsel was deficient for not calling Peaches or Mr. Whitehead as witnesses, defendant did not submit an affidavit from either of those individuals indicating what his or her testimony would have been.

Upon our review of the record, we conclude that defendant failed to demonstrate that Mr. Hunt's decision not to call certain individuals as witnesses at trial was outside the wide range of professionally competent assistance. Moreover, even assuming *arguendo* that defendant's counsel was deficient in that regard, defendant failed to demonstrate that, but for Mr. Hunt's decision not to present testimony of those individuals, there is a reasonable probability that the result of the proceeding would have been different. Thus, defendant's claim that he received ineffective assistance of counsel lacked merit. Accordingly, we overrule defendant's first assignment of error.

*State v. Towler,* 2006 WL 1351605 (Ohio App. 10th Dist. May 16, 2006). Again, the decision of the state appellate court is presumed to be correct. 28 U.S.C. §2254(d), (e). Petitioner has failed to establish that the state court's decision is unreasonable so as to justify federal habeas corpus relief. *See Williams v. Taylor, supra.*

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard

for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

This Court agrees with the state appellate court's conclusion that petitioner cannot establish prejudice, particularly in view of the substantial evidence against him, from counsel's failure to call Palmer or Whitehead as defense witnesses.

Claim one is without merit.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                             /s/ Terence P. Kemp
                                             United States Magistrate Judge